# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| GERRI S. COOGAN, the spouse of JERRY D. COOGAN, deceased, and JAMES P. SPURGETIS, solely in his capacity as the Personal Representative of the Estate of JERRY D. COOGAN, Deceased, | No. 51253-0-II |
| Respondents, | |
| vs. | ORDER GRANTING MOTION FOR RECONSIDERATION TO CORRECT ERRORS |
| BORG-WARNER MORSE TEC INC., (sued individually and as successor-in-interest to BORG-WARNER CORPORATION), et al., | |
| Defendants, | |
| GENUINE PARTS COMPANY d/b/a NATIONAL AUTOMOTIVE PARTS ASSOCIATION (a/k/a NAPA), and NATIONAL AUTOMOTIVE PARTS ASSOCIATION, | |
| Appellants. | |

Appellants Genuine Parts Company and National Automotive Parts Association request this court to reconsider its February 19, 2020 decision to correct two errors. After consideration, we grant Appellant's motion and amend the opinion in part as follows:

On page 2, in footnote 1, we remove "this prehearing" and replace it with "this opinion."

On page 28, in the second paragraph, we remove "Defense counsel's question" and replace it with "The Coogans' attorney's question."

We do not amend any other portion of the opinion or the result. Accordingly, it is

**SO ORDERED.**

MAXA, C.J.

We concur:

LEE, J.

MELNICK, J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| GERRI S. COOGAN, the spouse of JERRY D. COOGAN, deceased, and JAMES P. SPURGETIS, solely in his capacity as the Personal Representative of the Estate of JERRY D. COOGAN, Deceased, | No. 51253-0-II |
| Respondents, | UNPUBLISHED OPINION |
| vs. | |
| BORG-WARNER MORSE TEC INC., (sued individually and as successor-in-interest to BORG-WARNER CORPORATION); CATERPILLAR GLOBAL MINING, LLC (sued individually and as a successor-in-interest to BUCYRUS INTERNATIONAL f/k/a BUCYRUS-ERIE CO.); CERTAINTEED CORPORATION; DANA COMPANIES LLC (sued individually and as successor-in-interest to VICTOR GASKET MANUFACTURING COMPANY); DEERE & COMPANY d/b/a JOHN DEERE; FMC CORPORATION (d/b/a LINK-BELT Cranes and Heavy Construction Equipment); FORMOSA PLASTICS CORPORATION U.S.A. (sued individually and as parent, alter ego and successor-in-interest to J-M MANUFACTURING COMPANY and to J-M A/C PIPE CORPORATION); HOLLINGSWORTH & VOSE COMPANY; HONEYWELL INTERNATIONAL, INC. f/k/a ALLIED-SIGNAL, INC. (sued individually and as successor-in-interest to BENDIX CORPORATION); J-M MANUFACTURING COMPANY, INC. (sued individually and as parent and alter ego to J-M A/C PIPE CORPORATION); KAISER GYPSUM COMPANY, INC.; LINK-BELT CONSTRUCTION EQUIPMENT | |

COMPANY, L.P., LLLP; NORTHWEST DRYER & MACHINERY CO.; OFFICEMAX, INCORPORATED (f/k/a BOISE CASCADE CORPORATION); PARKER-HANNIFIN CORPORATION; PNEUMO ABEX LLC (sued as successor-in-interest to ABEX CORPORATION); SABERHAGEN HOLDINGS, INC. (sued as successor-in-interest to THE BROWER COMPANY); STANDARD MOTOR PRODUCTS, INC. d/b/a EIS; SPX CORPORATION (sued individually and as successor-in-interest to UNITED DOMINION INDUSTRIES LIMITED f/k/a AMCA International Corporation, individually and as successor in interest to Desa Industries Inc and/or Insley Manufacturing as well as Koehring Company, individually and as successor in interest to Schield Bantam Company); TEREX CORPORATION d/b/a Koehring Company individually and as successor in interest to Schield Bantam Company; and WELLONS, INC.,

Defendants,

GENUINE PARTS COMPANY d/b/a NATIONAL AUTOMOTIVE PARTS ASSOCIATION (a/k/a NAPA), and NATIONAL AUTOMOTIVE PARTS ASSOCIATION,

Appellants.

MAXA, C.J. – Genuine Parts Company (GPC) and National Automotive Parts Association (NAPA) appeal the trial court's order denying their motion for a new trial under CR 59 in a wrongful death action arising from Jerry "Doy" Coogan's death from peritoneal mesothelioma, a disease caused by exposure to asbestos. Doy[1] died less than six months after he first saw a doctor for symptoms and less than three months after he was diagnosed. Doy's estate, his wife

---

[1] To distinguish the members of the Coogan family from each other, this prehearing refers to them by their first names. No offense is intended.

Gerri Sue Coogan, and his adult daughters Roxana Coogan and Raquel Coogan Baxter (collectively the Coogans) filed suit against GPC, NAPA, and several other entities associated with the manufacture, distribution, and sale of products containing asbestos.

GPC and NAPA were the only defendants remaining after all the other defendants settled or were dismissed. After a lengthy trial, the jury found both GPC and NAPA liable for Doy's death. The jury entered an $81.5 million verdict, which consisted of $30 million to Doy's estate for his pain and suffering, $30 million to Doy's wife Sue for loss of marital consortium, $10 million each to Roxana and Raquel for their damages, and $1.5 million for the loss of Doy's services.

We reverse different portions of the damages verdict on independent grounds. First, we hold that the trial court erred in excluding the testimony of a medical expert who would have testified that Doy had stage 3 liver cirrhosis that likely would have shortened Doy's life expectancy to five years instead of 15 years. Therefore, a new trial is required on the loss of consortium and loss of services claims, which directly relate to Doy's life expectancy. Second, we hold (with one judge dissenting) that the $30 million verdict in favor of Doy's estate is so excessive that it shocks the court's conscience and therefore a new trial on the estate's claim is required under CR 59(a)(5).

We affirm the liability verdict against both GPC and NAPA. First, we hold (with one judge dissenting) that the trial court did not err in concluding that Doy's attorney did not commit misconduct in the presentation of evidence and during closing argument. Second, we hold that the trial court did not err in excluding evidence that five people who worked at the Spokane plant of Wagstaff, Inc. at roughly the same time as Doy had contracted asbestos-related diseases.

Third, we hold that the jury reasonably could infer from the evidence that NAPA was the manufacturer, distributor, or seller of asbestos-containing products.

Accordingly, we reverse in part, affirm in part, and remand for a new trial on damages only.

## FACTS

*Background*

Doy was 67 years old when he died in 2015. He and Sue were married in 2011, but they had lived together since 1995. Doy had two daughters from an earlier marriage: Roxana, who was 46 years old when Doy died; and Raquel, who was 44 years old when Doy died. Sue also had an adult daughter from a prior relationship, Kelly Marx.

GPC distributed automotive parts, including brakes and clutches, beginning in the 1920s. GPC's Rayloc division also remanufactured brakes and clutches using parts supplied by others. These products contained asbestos. GPC is a primary NAPA distributor and has owned and operated a NAPA auto parts distribution center in Spokane since the mid-1960s.

NAPA is a membership trade association. NAPA members own and operate retail auto parts stores and parts distribution centers, which are licensed to use the NAPA logo and trademark. Parts manufacturers also are licensed to use the NAPA logo and trademark on parts supplied to NAPA members. But NAPA claims that it does not own or operate any stores and does not sell or distribute any products.

Over the course of Doy's working and personal life, he was exposed to asbestos from multiple sources. These asbestos exposures included from GPC/Rayloc brakes and clutches and American Brakeblok brakes purchased from NAPA auto parts stores. Both types of brakes were

6

branded with the NAPA logo. Doy's brother Jay Coogan operated a NAPA store in Colville for several years, and Doy purchased Rayloc parts there.

Doy presented to a doctor in January 2015 with a swollen, distended belly and resulting pain. No evidence was presented regarding when his symptoms started. Doy was diagnosed with peritoneal mesothelioma in April 2015. Peritoneal mesothelioma is a cancer that occurs in the lining of the abdominal cavity and is an asbestos-related disease. Doy's health rapidly declined. He died on July 1, 2015.

The Coogans filed a wrongful death lawsuit against GPC, NAPA, and many other defendants alleging that Doy developed mesothelioma because of his exposure to asbestos-containing products and equipment manufactured, sold and/or distributed by the defendants. The Coogans settled their claims with some of these defendants before trial, some defendants were dismissed, and others settled during trial. GPC and NAPA were the only defendants remaining in the case when the jury rendered its verdict.

*Trial Evidence Regarding Doy's Pain and Suffering*

At trial, the jury heard evidence that Doy had developed malignant peritoneal mesothelioma as a result of exposure to asbestos. His decline and resulting death occurred rapidly, less than six months after first seeing a doctor for symptoms and less than three months after being diagnosed with peritoneal mesothelioma.

Doy's mesothelioma initially developed in the peritoneum (the membrane which lines the abdominal cavity) and eventually caused tumors in his abdomen, bowels, diaphragm, and lungs. Doy developed severe ascites (fluid build-up) in his abdomen, which resulted in the painful expansion of the belly as fluid pressed against organs and skin. This fluid build-up necessitated

regular drainage from his abdomen. A catheter was placed in his chest to drain the fluid building up around Doy's lungs. Doy eventually received three rounds of chemotherapy.

Doy experienced dyspnea, or "air hunger," a sensation of breathlessness caused by the fluid build-up around his lungs. He suffered pain-related insomnia, constipation, dehydration, and kidney failure. Doy's condition also resulted in malnutrition and cachexia, which is the weakness and wasting of the body due to severe chronic illness. His conditions required narcotic pain medicine that affected his cognitive awareness.

Roxana testified that Doy never let his family see him in pain and died with much dignity. But she stated that "I know he knew he was going to die." 18 Report of Proceedings (RP) at 79-80.

*Exclusion of Evidence*

The trial court excluded evidence in two areas. First, the court excluded the testimony of Dr. Gary Schuster, GPC's expert, that Doy had preexisting stage 3 cirrhosis of the liver. Dr. Schuster presented an opinion that stage 3 cirrhosis reduced Doy's life expectancy to five years rather than the 15 years indicated by the life expectancy tables. The trial court ruled that the expert testimony was inadmissible under ER 702 and also was unduly prejudicial under ER 403 because it included evidence of Doy's alcohol use.

Second, the trial court excluded five asbestos-related workers' compensation claims by employees who worked at Wagstaff, Inc. during roughly the same period as Doy in the late 1960s. All five workers were employed at Wagstaff during the late 1960s or early 1970s, worked with asbestos-containing boards, and later contracted asbestos-related diseases. The trial court ruled that this evidence was irrelevant because there was no evidence that Doy had similar exposures as the other workers.

*Challenged Conduct of Coogans' Attorney*

GPC alleges that the Coogans' attorney engaged in misconduct by pursuing three lines of questioning and by making three improper statements during closing argument. GPC did not object to any of the closing argument statements. The details regarding the challenged conduct are discussed below.

*NAPA CR 50(a) Motion*

Before the case was submitted to the jury, NAPA moved for judgment as a matter of law under CR 50(a). NAPA renewed an argument first made in a summary judgment motion that the Coogans' claims against NAPA should be dismissed because NAPA was not a seller or manufacturer of any products. The trial court denied the motion. The court noted "[t]he NAPA store, the NAPA advertising, . . . the manner in which they marketed NAPA products, the NAPA guarantee of quality" and decided to leave to the jury "NAPA's status based on their presentation to the consumer." 43 RP at 194.

*Jury Verdict*

The jury found both GPC and NAPA liable under common law theories of negligence, product liability design defect, and product liability failure to warn. Under the product liability theories, the jury found that both GPC and NAPA had manufactured, distributed, or sold products that were not reasonably safe.

The jury rendered a total verdict of $81.5 million, consisting of $30 million in non-economic damages to Doy's estate for his pain, suffering, anxiety, emotional distress, humiliation and fear; $30 million to Sue for loss of marital consortium; $10 million each to Roxana and Raquel for their damages, and $1.5 million in economic damages for the loss of

Doy's services.  After offsetting settlement amounts paid by other defendants, the trial court

entered judgment against GPC and NAPA for $77,105,000.

*Post-Trial Motions*

GPC and NAPA moved for a new trial under CR 59(a).  They argued that the verdict was

excessive and that the Coogans' attorney had committed misconduct during the presentation of

evidence and closing argument.  The trial court denied the motion.

GPC and NAPA appeal the trial court's denial of their CR 59(a) motion for a new trial

and the two referenced evidentiary rulings.  NAPA also appeals the trial court's denial of its CR

50(a) motion for judgment as a matter of law.

ANALYSIS

A.    DR. SCHUSTER'S OPINION REGARDING CIRRHOSIS

GPC argues that the trial court erred in excluding Dr. Schuster's expert medical opinion

that Doy had stage 3 liver cirrhosis and at most had five years to live instead of the 15 years

shown in the life expectancy tables.  We agree.

1.    Legal Principles

a.    ER 702

ER 702 states that a court may permit a witness qualified as an expert to provide an

opinion regarding scientific or specialized knowledge if such testimony may assist the trier of

fact.  "Admission is proper provided the expert is qualified and his or her testimony is helpful."

*Volk v. DeMeerleer*, 187 Wn.2d 241, 277, 386 P.3d 254 (2016).

However, an expert opinion that lacks adequate foundation must be excluded.  *Johnston-*

*Forbes v. Matsunaga*, 181 Wn.2d 346, 357, 333 P.3d 388 (2014).  Similarly, expert testimony

that is unreliable is not helpful to the jury and must be excluded. *Volk*, 187 Wn.2d at 277.

Speculative and conclusory expert testimony is not admissible. *See id.*

> Before allowing an expert to render an opinion, the trial court must find that there is an adequate foundation so that an opinion is not mere speculation, conjecture, or misleading. It is the proper function of the trial court to scrutinize the expert's underlying information and determine whether it is sufficient to form an opinion on the relevant issue.

*Johnston-Forbes*, 181 Wn.2d at 357.

In making the determination of whether an expert's opinion is admissible, the court must focus on the information supporting the expert's opinion, not the validity of the opinion. *Id.* "When Washington courts have previously refused to admit expert testimony as speculative, admission hinges on the expert's basis for forming the opinion, not on the expert's conclusions." *Volk*, 187 Wn.2d at 277.

"[T]rial courts are afforded wide discretion and trial court expert opinion decisions will not be disturbed on appeal absent an abuse of such discretion." *Johnston-Forbes*, 181 Wn.2d at 355. But an abuse of discretion occurs when the trial court's ruling is "unsupported by the record or result[s] from applying the wrong legal standard." *Gilmore v. Jefferson County Pub. Transp. Benefit Area*, 190 Wn.2d 483, 494, 415 P.3d 212 (2018).

b. ER 403

ER 403 states that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." " 'Evidence may be unfairly prejudicial under ER 403 if it is . . . likely to trigger an emotional response rather than a rational decision among the jurors.' " *Lodis v. Corbis Holdings Inc.*, 192 Wn. App. 30, 48, 366 P.3d 1246 (2015) (quoting *Hayes v. Wieber Enters., Inc.*, 105 Wn. App. 611, 618, 20 P.3d 496 (2001)). Another characterization of unfair prejudice is evidence that "appeals to the jury's

sympathies, arouses its sense of horror, provokes its instinct to punish, or 'triggers other mainsprings of human action.' " *Carson v. Fine*, 123 Wn.2d 206, 223, 867 P.2d 610 (1994) (quoting 1 JACK B WEINSTEIN & MARGARET A. BERGER, EVIDENCE § 403[03], at 403-36 (1985)).

However, ER 403 does not apply to "ordinary prejudice." *Carson*, 123 Wn.2d at 224. "[N]early all evidence will prejudice one side or the other in a lawsuit. Evidence is not rendered inadmissible under ER 403 just because it may be prejudicial." *Id.* ER 403 addresses only whether "unfair" prejudice outweighs the probative value of the evidence. *See id.*

In addition, the Supreme Court in *Carson* emphasized that "[t]he ability of the danger of unfair prejudice to substantially outweigh the probative force of evidence is 'quite slim' where the evidence is *undeniably probative of a central issue* in the case." *Id.* (emphasis added) (quoting *United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1041 (11th Cir. 1988)). Other courts have repeated this admonition. *E.g.*, *Gerlach v. Cove Apts., LLC*, 8 Wn. App. 2d 813, 820, 446 P.3d 624, *review granted*, 193 Wn.2d 1037 (2019); *Lodis*, 192 Wn. App. at 48.

We review the exclusion of evidence under ER 403 for an abuse of discretion. *Taylor v. Intuitive Surgical, Inc.*, 187 Wn.2d 743, 766, 389 P.3d 517 (2017).

2.    Pretrial Motion to Exclude

The Coogans' pretrial motion to exclude Dr. Schuster's testimony was based on excerpts from his deposition and a few medical records. Dr. Schuster's opinion was that (1) Doy had a significant alcohol ingestion history, (2) which probably led to cirrhosis, and (3) the "presence of the nodular liver, swollen liver, enlarged spleen, varices with increase[s] noted in the perisplenic and portal[] vasculature" was consistent with cirrhosis. Clerk's Papers (CP) at 4712. He also stated, "[W]e can assume that certainly ascites are related to mesothelioma, I have no doubt that that was there, however, certainly I believe that the cirrhosis was present enough." CP at 4712.

12

Regarding Doy's mortality, Dr. Schuster stated that "his liver being cirrhotic is approximately 20 percent per year, and so if that's the case, his longevity . . . would likely have been about 5 more years of life." CP 4712.

When asked how he arrived at his conclusion that Doy had cirrhosis of the liver, Dr. Schuster stated:

> [W]e have a 3-D CT that shows a nodular liver, enlarged spleen, which is consistent with a portal hypertension. We have got perisplenic portal and paracentesis . . . noted on the original CT. We have -- and obviously we have ascites, but it's complicated by the fact that he's got a peritoneal mesothelioma, however, one can't say that some of the evacuation [is] not from . . . the cirrhosis. The albumin is a little bit low, 2.6 or 2.7. All of these factors would on a prominent basis, plus[], significant alcohol ingest[ion] history, would make this more likely than not consistent with that diagnosis.

CP at 4714.

When asked how he concluded that Doy's lifespan would be reduced to five years, Dr. Schuster stated that Doy was a "stage 3 decompensated cirrhotic" because he had varices and ascites. CP at 4714. Earlier, Dr. Schuster had stated that "varices with ascites would be a stage 3 disease, which is the 20 percent cumulative undelayed death." CP at 4713. Regarding the ascites, Dr. Schuster stated, "[C]ertainly I can say there's contribution substantially from the cancer, but you cannot exclude, and *given all the other co-factors, you can't say that the ascites was also not involved with the cirrhosis some*. He's got ascites and therefore, that puts him at a stage 3." CP at 4714 (emphasis added).

A CT scan taken in January 2015 (before Doy was diagnosed with mesothelioma) showed a large amount of ascites, associated cirrhosis and portal hypertension, as well as nodularity. An ultrasound on the same date showed ascites surrounding the liver and one impression was "reduced size of the liver suggesting cirrhosis." CP at 4721. In a consultation report, a doctor's impression was "[c]irrhosis of the liver by CT scan associated with ascites,

portal hypertension, varices, and hypersplenomegaly." CP at 4719. But the doctor was bothered by the fact that Doy had "normal liver function tests" and "no stigmata of liver disease on exam." CP at 4719.

The trial court excluded this testimony in a pretrial ruling because of the "unreliable basis for that opinion" and under ER 403 because of "the prejudicial effect of characterizing [Doy] as an alcoholic, a chronic, heavy drinker." 2 RP at 97. The court stated, "I think that the prejudicial value greatly outweighs the probative value." 2 RP at 99.

3.    Offer of Proof During Trial

The trial court revisited the subject of Dr. Schuster's testimony during trial. As an offer of proof, Dr. Schuster testified outside the jury's presence regarding his opinions.

a.    Dr. Schuster Testimony

Dr. Schuster had an extensive background in diagnostics and internal medicine, including the diagnosis and treatment of cirrhosis. In developing his opinions, he reviewed Doy's medical records and diagnostic imaging reports.

Dr. Schuster stated his opinion that Doy "had a stage 3 level of liver disease or cirrhosis" and as a result had a "lifespan of a maximum of approximately five years." 26 RP at 145. He explained the three stages of cirrhosis, culminating in the development of ascites.

Regarding ascites, Dr. Schuster stated, "[T]here is absolutely no question in my mind that the ascites is also contributed to significantly because of the peritoneal tumor. That's not a question. But what's important to understand is *at the point that he had an enlarged spleen . . . now you have a situation where that is going to create some ascites, as well*." 26 RP at 146-47 (emphasis added). Dr. Schuster stated that the key supporting factors for his opinion was a nodular liver, enlarged spleen, and enlarged vessels.

Dr. Schuster also emphasized that "it's clear in the literature you can have normal liver function tests in the presence of stage 3 cirrhosis." 26 RP at 148. In fact, Dr. Schuster testified at length that normal liver tests do not mean that a person does not have cirrhosis. He relied on four articles from medical journals to support this opinion. Dr. Schuster testified that one of the articles stated that "chronic liver disease . . . usually is asymptomatic until it's [*sic*] late stages." 26 RP at 149. He concluded, "You often see abnormal liver function tests. No one is denying that. But you can have normal [test results] and have cirrhosis." 26 RP at 150.

Dr. Schuster explained that a person with stage 2 cirrhosis does not have ascites, and has a much longer life expectancy. A person has stage 3 cirrhosis when ascites are present. At that point, a person's life expectancy is five years.

Dr. Schuster noted that none of Doy's treating physicians ruled out cirrhosis. He stated that once the doctors made the mesothelioma diagnosis, they ascribed the ascites to that and stopped looking at cirrhosis.

Dr. Schuster agreed that the record showed that Doy had a substantial history of alcohol use. This included one estimate of five to seven beers and one estimate of six to eight beers a day, plus a couple of cocktails. Dr. Schuster stated that the record he saw indicated that this consumption had gone on for 20 years and possibly longer.

On cross-examination, Dr. Schuster admitted that a significant source of the ascites was Doy's cancer. When asked whether he had determined how much of the fluid buildup was because of the mesothelioma versus the cirrhosis, Dr. Schuster stated:

> You can't. It contributes. *So what you have to say is based on where his liver dysfunction was, it would be expected that there would likely be some fluid accumulating, some ascites* given perisplenic and periportal hypertension based on the varices and the findings that we're seeing.

15

Now, it doesn't mean that none of the ascites, as I said earlier, was not from the tumor. It clearly was tumor related.

26 RP at 160 (emphasis added).

The following question and answer then occurred:

Q. You said that a significant amount of it would have been the tumor. I guess my follow-up question is whether zero percent, one percent, 12 percent would have been because of your belief of cirrhosis? Anyway to figure that out?

A. You can't. The point is he did have cirrhosis.

26 RP at 160.

Dr. Schuster later agreed that stage 3 cirrhosis requires the presence of ascites. He also agreed that the sole basis for his opinion that Doy had a five year life expectancy was his belief that Doy had *stage 3* cirrhosis.

The following question and answer occurred:

Q. Is there anything else that you considered at all, in terms of staging the alleged cirrhosis that Doy Coogan had, other than the presence of his ascites?

A. Sure. As I had mentioned earlier, *the ascites reflects the liver dysfunction*, which we know he has large portal veins, the varices. He has an enlarged spleen.

26 RP at 163 (emphasis added).

b.    Trial Court Ruling

After hearing the offer of proof, the trial court stated that under ER 701-705, the court in its gatekeeping function must "find that the evidence will be probative of an issue that is properly before the jury and that the evidence proffered would have relevance beyond [its] prejudicial effect." 26 RP at 165. The court concluded that "I do not believe that that threshold has been met." 26 RP at 165.

The court indicated that the evidence did not show that Doy had stage 3 cirrhosis because he had normal liver function tests:

16

> [W]hat I heard was that in the literature the blood chemistry, which in Mr. Doy Coogan was normal, can remain normal until the last stages -- plural, stages -- and since there are four stages of cirrhosis of the liver, the last stages would be three and four. And I believe Dr. Schuster stated that at some point with stage 3 cirrhosis, one would expect to see at least an elevation to the top end of the normal range in an individual that was suffering from cirrhosis.

26 RP at 165-66.

The court also concluded that the ascites resulted only from the mesothelioma:

> The ascites, I'm convinced based upon the medical information that has been promulgated so far, is the result of the peritoneal mesothelioma. Dr. Schuster appropriately acknowledges that it is probably the main contributing factor. And he is unable to tease out the degree to which, if any, the cirrhosis was also a factor in the development of these ascites. But the records, medical records, indicate that the ascites did not develop, or at least were not discovered, until and contemporaneous with the discovery of advanced peritoneal mesothelioma, which within seven months of [t]his discovery caused Mr. Coogan's death.

26 RP at 166.

Finally, the trial court noted that no other witnesses testified that Doy had cirrhosis. "[N]one of the treating physicians or the examining specialist have ever affirmatively testified that Mr. Doy Coogan suffered from cirrhosis of the liver and had a shortened life expectancy on that basis, nor are they expected to so testify." 26 RP at 166.

The court concluded, "The determination that Mr. Coogan's life expectancy was between one and five years under these circumstances, because of a diagnosis of cirrhosis of the liver, becomes too attenuated and in many respects speculative." 26 RP at 166.

4. ER 702 Analysis

Here, the parties do not dispute that Dr. Schuster was a qualified expert in internal medicine, and the trial court recognized him as such. The only question then is whether Dr. Schuster's opinion on Doy's life expectancy was speculative and therefore not helpful to the jury.

17

Dr. Schuster's key opinion was that Doy had *stage 3* cirrhosis. Only if the cirrhosis had reached stage 3 would Doy's life expectancy be limited to five years. And a person has stage 3 cirrhosis only if ascites are present. Doy had ascites, but Dr. Schuster acknowledged that the mesothelioma contributed significantly to their development. However, he also testified that the cirrhosis also would have caused the ascites to some unknown degree.

The trial court stated that Dr. Schuster's opinion was too attenuated and speculative, essentially concluding that the opinion did not have an adequate foundation. But the trial court's oral ruling suggests that the court was improperly weighing the evidence rather than evaluating the foundation of Dr. Schuster's opinions. In other words, the court acted as a fact finder rather than a gatekeeper regarding Dr. Schuster's testimony.

First, the court asserted that "the literature" stated that blood chemistry could remain normal until the "last stages" of cirrhosis, and because "stages" was plural that word must refer to both stage 3 and stage 4. 26 RP at 165. The court also stated that Dr. Schuster testified that a person with stage 3 cirrhosis would have an elevation to the top of the normal range. The court seemed to be suggesting that because Doy's liver function tests were normal, he could not have had stage 3 cirrhosis.

However, Dr. Schuster very clearly gave an opinion that a person could have stage 3 cirrhosis with normal liver function tests. And he provided the foundation for that opinion – four articles from medical journals that supported his testimony. Instead of acknowledging that foundation, the court interpreted the plural term "last stages" in one of the articles Dr. Schuster relied on as stating that a person would not have normal liver function tests at stage 3. But Dr. Schuster's did not say that "last stages" in the article referred to stage 3. And the other three articles did not contain a similar statement. Essentially, the court concluded that his

interpretation of one term in one article outweighed Dr. Schuster's opinion, supported by three other articles, that a person could have stage 3 cirrhosis with normal liver function tests.

Further, the court misstated Dr. Schuster's testimony. Dr. Schuster did not testify that "one would expect to see at least an elevation to the top end of the normal range in an individual that was suffering from cirrhosis" as the court stated. 26 RP at 166.

Second, the trial court stated, "The ascites, *I'm convinced* based upon the medical information that has been promulgated so far, is the result of the peritoneal mesothelioma." 26 RP at 166 (emphasis added). This comment suggests that the court was engaging in a fact-finding role rather than a gatekeeper role. Dr. Schuster gave an opinion that the cirrhosis also was contributing to the ascites, and provided the foundation for that opinion – that the level of liver dysfunction and the enlarged spleen meant that ascites would be expected. Instead of acknowledging that foundation, the court simply disagreed with Dr. Schuster's opinion.

The court also emphasized that Dr. Schuster could not state the degree to which the cirrhosis contributed to the ascites compared to the mesothelioma. But that degree was immaterial to Dr. Schuster's opinion. He was clear that Doy had cirrhosis that caused some ascites, which meant that he had stage 3 cirrhosis.

The Coogans point out that Dr. Schuster was asked on cross-examination whether he could say whether zero percent, or one percent, or 12 percent of Doy's ascites related to cirrhosis, and he answered "You can't." 26 RP at 160. They claim that this constituted an admission that he could not tell whether cirrhosis caused any of the ascites. But Dr. Schuster followed up by saying, "The point is *he did have cirrhosis*." 26 RP at 160 (emphasis added). And in other parts of his testimony he made it clear that his opinion was that cirrhosis did contribute to the ascites to some degree.

19

Third, the trial court noted that none of the treating physicians or the examining specialist had testified that Doy had cirrhosis. But this is not an appropriate consideration for evaluating the foundation of an expert's testimony. Experts often disagree with each other. Just because an expert has a different opinion than other witnesses says nothing about the reliability of that expert's testimony.

In conclusion, the trial court's oral ruling reveals that the court was not addressing the adequacy of the foundation of Dr. Schuster's opinions. The court was articulating arguments to support the court's conclusion that Dr. Schuster's opinion was incorrect. In other words, the court was focusing on Dr. Schuster's actual opinions, not the basis for forming those opinions. *See Volk*, 187 Wn.2d at 277.

We conclude that the trial court abused its discretion in excluding Dr. Schuster's testimony under ER 702.

5.    ER 403 Analysis

The trial court based its ruling in part on ER 403. In its pretrial ruling, the trial court stated that characterizing Doy as "an alcoholic, a chronic, heavy drinker" was "unduly prejudicial" under ER 403. 2 RP at 97. After hearing the offer of proof, the court ruled that Dr. Schuster's opinion did not meet the threshold requirement that evidence be probative of an issue before the jury and relevant beyond its prejudicial effect, and was concerned about admitting evidence of Doy's alcohol use.

Evidence of prior alcohol abuse has the potential to be very prejudicial. *Colley v. PeaceHealth*, 177 Wn. App. 717, 733, 312 P.3d 989 (2013); *see also Kramer v. J.I. Case Mfg. Co.*, 62 Wn. App. 544, 559-60, 815 P.2d 798 (1991). However, in his offer of proof Dr. Schuster did not testify about the *cause* of Doy's cirrhosis. And the offer of proof included only a brief

reference to Doy's substantial history of alcohol use. Doy's alcohol use clearly was not an integral part of Dr. Schuster's testimony.

Further, before trial defense attorneys offered to introduce Dr. Schuster's opinion without stating that Doy was an alcoholic, referencing Doy's pattern of alcohol consumption, or making the connection between cirrhosis and alcohol consumption. Even though this offer was not renewed during the offer of proof, the trial court could have precluded Dr. Schuster from referencing alcohol in his testimony. This alternative would have allowed Dr. Schuster to give his opinions that Doy had stage 3 cirrhosis which reduced his life expectancy to five years without discussing prejudicial information about Doy's alcohol consumption.

In addition, Dr. Schuster's testimony was "undeniably probative of a central issue in the case." *Carson*, 123 Wn.2d at 224. The claims of Doy's wife and adult children directly depended on how long Doy likely would live, making that a central issue. Therefore, whether Doy had a life expectancy of five years rather than 15 years as shown by the life expectancy tables was highly probative. The Supreme Court in *Carson* indicated that ER 403 generally cannot be used to exclude crucial evidence. *See id.*

The Coogans argue that Dr. Schuster's testimony had minimal probative value, claiming that he lacked support for his opinion that Doy had stage 3 cirrhosis. However, as discussed above, Dr. Schuster's opinions had enough of a foundation to make his testimony admissible under ER 702. And the Coogans' *argument* that his testimony should be given little weight does not mean that the testimony was not probative of a central issue in the case.

We conclude that the trial court abused its discretion by excluding Dr. Schuster's highly probative testimony under ER 403 rather than simply precluding any reference to alcohol in that testimony.

6. Summary

The trial court abused its discretion in ruling that Dr. Schuster's opinion testimony regarding Doy's life expectancy should not be admitted under ER 702 and ER 403. Accordingly, we hold that the trial court erred in excluding that testimony. We order a new damages trial on the loss of consortium and loss of services claims because those claims necessarily were impacted by Doy's life expectancy.

B. EXCESSIVENESS OF PAIN AND SUFFERING VERDICT

GPC and NAPA argue that the trial court abused its discretion in denying their motion for a new trial under CR 59(a)(5) because the jury's $81.5 million verdict was excessive. We do not address this issue for the damages awarded on the loss of consortium and loss of services claims because we have ordered a new trial on those claims based on the erroneous exclusion of Dr. Schuster's testimony. We hold that the $30 million verdict in favor of the estate for Doy's pain and suffering is excessive and that a new trial is required on that claim under CR 59(a)(5).

1. Legal Principles

Under CR 59(a)(5), a party may move for vacation of the verdict and a new trial based on "[d]amages so excessive or inadequate as unmistakably to indicate that the verdict must have been the result of passion or prejudice."

We generally will not disturb the jury's verdict unless it (1) "is outside the range of substantial evidence in the record," (2) "appears to have been arrived at as the result of passion or prejudice," or (3) "shocks the conscience of the court." *Bingaman v. Grays Harbor Cmty. Hosp.*, 103 Wn.2d 831, 835, 699 P.2d 1230 (1985); *see also Bunch v. King County Dep't of Youth Servs.*, 155 Wn.2d 165, 179, 116 P.3d 381 (2005); *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 268, 840 P.2d 860 (1992).

First, although noneconomic damages generally are within the jury's discretion, the verdict still must be based on some evidence. *Bunch*, 155 Wn.2d at 180. "Damages need not be proved with mathematical certainty, but must be supported by competent evidence." *Hill v. GTE Directories Sales Corp.*, 71 Wn. App. 132, 140, 856 P.2d 746 (1993).

Second, if a verdict is supported by substantial evidence, we cannot find that the verdict was the result of passion and prejudice based on the size of the verdict alone. *Brundridge v. Fluor Fed. Servs., Inc.*, 164 Wn.2d 432, 454, 191 P.3d 879 (2008). "Before passion or prejudice can justify reduction of a jury verdict, it must be of such manifest clarity as to make it unmistakable." *Bingaman*, 103 Wn.2d at 836. The record must show that "the jury was prejudiced or incited to passion." *Washburn*, 120 Wn.2d at 280. For example, extreme or inflammatory incidents may occur at trial that could not be neutralized by curative instructions. *Bunch*, 155 Wn.2d at 183.

Third, if the evidence supports the verdict and the record does not show unmistakable passion or prejudice, the question is whether the size of the verdict "shocks the conscience of the court." *Bingaman*, 103 Wn.2d at 836-37. The test is whether the damages awarded were "flagrantly outrageous and extravagant." *Id.* at 837. The damages must strike the court " 'at first blush, as being, beyond all measure, unreasonable and outrageous.' " *Bunch*, 155 Wn.2d at 179 (quoting *Kramer v. Portland-Seattle Auto Freight, Inc.*, 43 Wn.2d 386, 395, 261 P.2d 692 (1953)). An "outrageous" verdict is one that is " ' so flagrantly bad that one's sense of decency or one's power to suffer or tolerate is violated.' " *Washburn*, 120 Wn.2d at 279 (quoting *Webster's Third New International Dictionary* 1603 (1981)). However, the verdict "does not carry its own death warrant solely by reason of its size." *Bingaman*, 103 Wn. 2d at 838.

We focus on this third basis for granting relief under CR 59(a)(5). The question here is whether the $30 million pain and suffering verdict shocks this court's conscience.

When analyzing whether a verdict is so excessive as to warrant a new trial under CR 59(a)(5), we must recognize that the Washington Constitution delegates to the jury the determination of damages and protects that role. *Bunch*, 155 Wn.2d at 179; *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 645-46, 771 P.2d 711, 780 P.2d 260 (1989). The jury's role is particularly essential in determining noneconomic damages. *Sofie*, 112 Wn.2d at 646. The determination of the amount of damages in actions involving noneconomic damages "is primarily and peculiarly within the province of the jury . . . and the courts should be and are reluctant to interfere with the conclusion of a jury when fairly made." *Bingaman*, 103 Wn.2d at 835. As a result, "[w]e strongly presume the jury's verdict is correct." *Bunch*, 155 Wn.2d at 179.

We review for abuse of discretion a trial court's denial of a CR 59(a) motion for a new trial. *Collins v. Clark County Fire Dist. No. 5*, 155 Wn. App. 48, 81, 231 P.3d 1211 (2010). In addition, "deference and weight are given to the evaluation of the trial court's exercise of discretion in denying a new trial on a claim of excessiveness." *Washburn*, 120 Wn.2d at 271. The verdict is strengthened by the trial court's denial of a new trial. *Id.* As a result, "it should be and indeed is the rare case where we should substitute our judgment for that of the jury." *Id.* at 278.

2. Excessive Verdict Analysis

The jury was instructed that it could consider the following to compensate Doy's estate for noneconomic damages: "The pain, suffering, anxiety, emotional distress, humiliation and fear experienced by Doy Coogan prior to his death from mesothelioma." CP at 14988. The damages

instruction stated, "The law has not furnished us with any fixed standards by which to measure noneconomic (pain and suffering) damages. With reference to these matters you must be governed by your own judgment, by the evidence in the case, and by these instructions." CP at 14988. The jury awarded $30 million for Doy's noneconomic damages.

At trial, the jury heard evidence that Doy had developed malignant peritoneal mesothelioma as a result of exposure to asbestos. He first presented with symptoms on January 11, 2015. His decline and resulting death occurred rapidly, less than six months after presenting to a doctor with symptoms and less than three months after being diagnosed with peritoneal mesothelioma.

There is no question that Doy experienced "pain, suffering, anxiety, emotional distress, humiliation and fear," which the jury was instructed to consider. CP at 14988. And we acknowledge that the trial court did not believe that the verdict was excessive, and we do not lightly disregard the court's opinion. Finally, we recognize the reluctance of courts to overturn jury verdicts involving noneconomic damages.

However, this is the rare case where we must disregard the jury's verdict and the trial court's refusal to find the verdict excessive. The $30 million in noneconomic damages awarded to Doy's estate is so excessive that it shocks the court's conscience. Doy's health apparently was unaffected until the last six months of his life. And the more severe symptoms occurred during the last three months. Given the short time that Doy was sick, the jury's $30 million award was "flagrantly outrageous and extravagant" on its face. *Bingaman*, 103 Wn.2d at 837. The award amounted to over $164,000 for each day and over $5 million for each month from Doy's first presentation with symptoms to a doctor until his death.

Our determination necessarily is a subjective one. The Supreme Court has provided no objective basis for evaluating whether a verdict is excessive under CR 59(a)(5). *See Washburn*, 120 Wn.2d at 266-68 (prohibiting the court from assessing excessiveness by comparing the verdict against verdicts in other cases). We simply believe, at first blush, that the pain and suffering verdict here is " 'beyond all measure, unreasonable and outrageous.' " *Bunch*, 155 Wn.2d at 179 (quoting *Kramer*, 43 Wn.2d at 395).

Accordingly, we hold that the trial court abused its discretion in denying GPC's CR 59(a)(5) motion with regard to the noneconomic damages award to Doy's estate.

C.      EFFECT OF DAMAGES REVERSAL ON LIABILITY VERDICT

A new trial on damages does not necessarily require a new trial on the issue of liability. *See Dexheimer v. CDS, Inc.*, 104 Wn. App. 464, 477, 17 P.3d 641 (2001). A limited new trial can be ordered when " 'the original issues were distinct and separate from each other and . . . justice does not require the resubmission of the whole case to the jury.' " *Id.* (quoting *Keegan v. Grant County Pub. Util. Dist. No. 2,* 34 Wn. App. 274, 285, 661 P.2d 146 (1983)).

Here, the liability and damages issues were separate and distinct. Therefore, the new trial we order on the issue of damages does not automatically result in a new trial on liability.

However, GPC argues that the liability verdict must be reversed because of the alleged misconduct of the Coogans' attorney and the trial court's alleged error in excluding evidence that five employees who worked at Wagstaff, Inc. during roughly the same period as Doy contracted asbestos-related diseases. And NAPA argues that the trial court erred by not dismissing NAPA at the end of the trial. Therefore, we must address those arguments.[2]

_____

[2] GPC also argues that the trial court erred in denying its motion to set aside the verdict under CR 60(b)(3) and (4) based on witness statements written in 2016 showing that that Doy and Sue's relationship and marriage was very unhappy. The Coogans did not disclose these

D.    ATTORNEY MISCONDUCT

GPC argues that the trial court abused its discretion in denying its motion for a new trial

under CR 59(a)(2).  GPC contends that the Coogans' attorney's questioning of witnesses and

comments in closing argument constituted misconduct that materially affected GPC's and

NAPA's substantial rights and caused the jury to base its verdict on passion and prejudice.  We

disagree.

1.    Legal Principles

CR 59(a)(2) provides that a verdict may be vacated and a new trial granted if

"misconduct of [the] prevailing party" materially affects the substantial rights of the other party.

We review a trial court's denial of a motion for a new trial under CR 59(a)(2) for abuse of

discretion.  *Alum. Co. of Am. v. Aetna Cas. & Sur. Co.*, 140 Wn.2d 517, 537, 998 P.2d 856

(2000).  In reviewing the trial court's decision, we consider whether " 'such a feeling of

prejudice [has] been engendered or located in the minds of the jury as to prevent a litigant from

having a fair trial.' "  *Id.* (quoting *Moore v. Smith*, 89 Wn.2d 932, 942, 578 P.2d 26 (1978)).

"The trial court is in the best position to most effectively determine if counsel's misconduct

prejudiced a party's right to a fair trial."  *Miller v. Kenny*, 180 Wn. App. 772, 815, 325 P.3d 278

(2014).

A party seeking a new trial based on counsel's conduct must establish that (1) the

conduct was misconduct, (2) the misconduct was prejudicial, (3) the misconduct was objected to

---

statements to GPC and NAPA before trial, and GPC claims that they either constituted newly
discovered evidence or reflected misconduct of the Coogans in failing to disclose them.  We do
not address these arguments because they relate solely to the issue of damages, and we already
are remanding for a new damages trial.

at trial, and (4) the misconduct was not cured by the trial court's instructions. *Teter v. Deck*, 174 Wn.2d 207, 226, 274 P.3d 336 (2012).

Unless the record clearly shows some prejudicial effect, we must defer to the trial court's denial of a new trial because the trial court is in the best position to assess the prejudicial impact of counsel's conduct on the jury. *Gilmore*, 190 Wn.2d at 503. This is particularly the case when the grounds for a new trial involve an assessment of counsel's misconduct during trial and the potential effect on the jury. *Id.*

### 2. Questioning of Witnesses

GPC argues that questions the Coogans' attorney asked when examining witnesses constituted misconduct that required a new trial under CR 59(a)(2). We agree that one of the Coogans' attorney's questions was improper, but we disagree that a new trial is required.

#### a. Legal Principles

The Rules of Evidence impose a duty on counsel to keep inadmissible evidence from the jury. ER 103(c). Continually and knowingly asking questions that are objectionable is misconduct. 14A DOUGLAS J. ENDE, WASHINGTON PRACTICE: CIVIL PRACTICE § 30:34 (3d ed. 2018). Even where the court sustains the objections, the misconduct is still prejudicial because it forces opposing counsel to make constant objections. *Id.* "[R]epeated objections, even if sustained, leave the jury with the impression that the objecting party is hiding something important. Misconduct that continues after warnings can give rise to a conclusive implication of prejudice." *Teter*, 174 Wn.2d at 223.

In *Teter*, the Supreme Court upheld the trial court's grant of a new trial based on counsel's misconduct. *Id.* at 222. In that case, defense counsel repeatedly tried to elicit testimony about subjects the court ruled inadmissible or irrelevant and placed exhibits before the

jury that had not been admitted. *Id.* at 223. Defense counsel also violated the trial court's prohibition on speaking objections and two orders limiting admissible evidence. *Id.* at 224.

b. Implying that Rayloc Brakes had Caused Other Asbestos-Related Deaths

GPC argues that the Coogans' attorney engaged in misconduct by asking a question implying that workers at GPC's Rayloc facilities had died from asbestos-related diseases.

Before trial, the parties stipulated that no party could present evidence about any asbestos exposure or asbestos-related disease of workers at defendants' plants or any claims by those workers. During trial, the court rejected two juror questions about precautions against asbestos exposure at Rayloc plants and lawsuits by Rayloc employees.

On redirect examination of GPC's corporate representative Liane Brewer, the Coogans' attorney asked "So you brought up employees, . . . trying to show us why you believe Genuine Parts Company is a family. . . . Do you know how many other men that worked in their headquarters where they were making Raylock [*sic*] brakes have died from asbestos-related disease and haven't been called?" 22 RP at 84. GPC objected. The trial court sustained the objection, stating that this issue was not relevant.

GPC immediately moved for a mistrial on the basis of this question. The trial court denied the motion. The following day, the trial court provided the jury with a curative instruction:

> Yesterday Plaintiffs' counsel asked a question of Ms. Brewer regarding deaths at the Rayloc facility. There will be no evidence of deaths at the Rayloc facility related to asbestos exposure in this case. You may not consider such fact in your deliberations of this case, and you may not discuss that in your deliberations of the case.

23 RP at 55.

GPC argues that the Coogans' attorney's question improperly implied that there had been asbestos-related deaths at its Rayloc facility, that the court's curative instruction was insufficient to cure this improper implication, and that as a result GPC and NAPA were prejudiced.

Defense counsel's question clearly was improper and violated the trial court's pretrial ruling, and the trial court's instruction could have been worded better. However, we conclude that it does not rise to the level of misconduct that requires a reversal of the liability verdict. This was one isolated question in a complex trial. As the trial court noted:

> I have to point out that in a three-month long trial, it is impossible not to be able to go through a record and pull out this question and that one and string together an argument that looks like there was some prejudice when the great mass of the evidence is what the jury is supposed to consider and what I have to assume they did consider.

RP (Dec. 1, 2017) at 56.

The standard of review is abuse of discretion. We hold that the trial court did not abuse its discretion in denying GPC and NAPA's CR 59(a)(2) motion for a new trial on this basis.

### c. Implying that GPC Acted in Bad Faith in Selecting Corporate Witness

GPC argues that the Coogans' attorney engaged in misconduct by asking questions implying that GPC's corporate representative, Byron Frantz, should not have been selected to testify on GPC's behalf because he was not prepared to answer questions. GPC claims that these questions constituted misconduct because they left the jury with the impression that GPC and NAPA were intentionally trying to hide the truth by selecting a corporate witness who knew too little.

During Frantz's testimony, the trial court rejected a juror question asking why Frantz had not reviewed materials to better answer questions. The court rejected the question because it was a comment on the evidence.

30

On redirect examination of Brewer, the Coogans' attorney asked, "Do you have any idea why out of this entire [GPC] family of thousands of people Byron Frantz, a person who couldn't answer any questions, was the one that was brought[?]" 22 RP at 101. The trial court sustained GPC's objection and instructed the Coogans' attorney not to "comment on the evidence." 22 RP at 101. The Coogans' attorney then asked Brewer "Do you have any understanding why the people that you know personally, people like Larry Prince [former CEO] were not present?" 22 RP at 102. The trial court again sustained GPC's objection to this question, stating that the answer was not relevant as "the company is entitled to select its corporate representative and why they do that is up to them." 22 RP at 102.

We need not decide whether these questions were improper because GPC cannot show prejudice. Frantz's lack of preparedness was apparent. At least one juror noticed and asked a question (rejected by the trial court) why Frantz had not reviewed case materials to better answer questions. And in ruling on the CR 59(a)(2) motion, the trial court stated, "I was unimpressed with Mr. Frantz's preparation to answer the questions that were put to him by Plaintiff. He, frankly, sounded to me evasive and unknowing." RP (Dec. 1, 2017) at 20. In addition, any prejudice that may have resulted from these questions was cured by the trial court's comment that GPC was "entitled to select its corporate representative and why they do that is up to them." 22 RP at 102.

Therefore, we hold that the trial court did not abuse its discretion in denying GPC and NAPA's CR 59(a)(2) motion for a new trial on this basis.

d.    Eliciting Response from Jay Coogan about Defense Counsel

GPC argues that the Coogans' attorney engaged in misconduct by asking a question that elicited an outburst from Jay Coogan that defense counsel had accused him of killing his brother.

31

On redirect examination of Jay, the Coogans' attorney asked him why he "needed to pretty regularly blow off steam" while being deposed by GPC's attorney and Jay replied "[s]ome of the questions that were asked of me in the deposition were very offensive." 16 RP at 159. After GPC's attorney made a relevance objection, which the court denied, Jay added "At one point she [GPC's counsel] accused me of killing my brother." 16 RP at 160. The trial court immediately struck this statement, telling the jury that even if true, Jay's comment was irrelevant and should be removed from their consideration of the issues in the case.

The question asked by the Coogans' attorney appears to have been intended to rebut GPC's implication that Jay and the Coogans' attorney were romantically involved and spending a lot of time together discussing matters other than the case.[3] The Coogans' attorney did not ask directly whether GPC had accused Jay of killing his brother by selling him auto parts containing asbestos. Instead, he volunteered this information. In addition, Jay's potential liability in the case as the owner of the NAPA store where Doy bought his auto parts had been raised by both parties at various points throughout trial, including by GPC's attorney when she cross-examined Jay.

Even if the Coogans' attorney improperly elicited Jay's "outburst," any prejudice that may have resulted was cured by the trial court's immediate, sua sponte striking of the statement and instruction to the jury that the remark was irrelevant and should be totally removed from their consideration.

Therefore, we hold that the trial court did not abuse its discretion in denying GPC and NAPA's CR 59(a)(2) motion for a new trial on this basis.

---

[3] Both the Coogans' attorney and Jay denied any improper relationship, and there was no evidence that supported GPC's implication.

3.    Closing Argument Statements

GPC argues that the Coogans' attorney made statements during closing argument that constituted misconduct and required a new trial under CR 59(a)(2).  GPC claims that the Coogans' attorney (1) made improper "golden rule" arguments, (2) urged the jury to punish the wealthy defendants, and (3) expressed her personal opinions about the case.[4]

a.    Failure to Object

GPC and NAPA did not object to any of the challenged statements the Coogans' attorney made during closing argument, even after the trial court invited parties at the end of closing to place any objections on the record.  The Coogans argue that this failure to object waived GPC's misconduct claim.

An objection is one of the requirements for a new trial based on counsel's conduct. *Teter*, 174 Wn.2d at 226.  The lack of a prompt objection is strong evidence that opposing counsel did not perceive an error.  *Gilmore*, 190 Wn.2d at 504.  " '[A]bsent an objection to counsel's remarks, the issue of misconduct cannot be raised for the first time in a motion for a new trial unless the misconduct is so flagrant that no instruction could have cured the prejudicial effect.' " *Collins*, 155 Wn. App. at 94 (quoting *Sommer v. Dep't. of Soc. & Health Servs.*, 104 Wn. App. 160, 171, 15 P.3d 664 (2001).

This rule is consistent with the general rule that a party must object and request a curative admonition or instruction in order to obtain a reversal based on an improper closing argument. *Joyce v. Dep't. of Corr.*, 155 Wn.2d 306, 326, 119 P.3d 825 (2005).  The rule is meant to prevent parties from gambling on a favorable verdict before claiming error.  *Teter*, 174 Wn.2d at 225.

---

[4] Most of the challenged statements relate primarily to damages and not to liability.  However, we address them to the extent they may have affected the liability verdict.

Because there was no objection to any of the challenged closing argument comments, GPC and NAPA must establish that the Coogans' attorney's misconduct was " 'so flagrant that no instruction could have cured the prejudicial effect.' " *Collins*, 155 Wn. App. at 94 (quoting *Sommer*, 104 Wn. App. at 171).

### b. "Golden Rule" Arguments

GPC argues that the Coogans' attorney committed misconduct by making improper "golden rule" arguments. The "golden rule" is a standard for individual conduct: do unto others as you would have them do unto you. *Adkins v. Alum. Co. of Am.*, 110 Wn.2d 128, 139, 750 P.2d 1257, 756 P.2d 142 (1988). In general, counsel's references or allusions to the "golden rule" are improper, including "urging the jurors to place themselves in the position of one of the parties to the litigation, or to grant a party the recovery they would wish themselves if they were in the same position." *Id.*

In closing, the Coogans' attorney repeatedly used the words "you" and "your" when describing Doy's disease, suffering, and emotions. For example, the attorney stated, "When [the disease] spread to his lungs, it means *you're* gasping to breathe as *your* body rots. And *you* know there's nothing *you* can do." 47 RP at 153 (emphasis added). GPC argues that the Coogans' counsel framed her argument in this way in order to inflame the jury's passion and prejudices by encouraging them to put themselves in Doy's position as he suffered and died of mesothelioma.

However, the Coogans' attorney did not explicitly ask the jurors to put themselves in Doy's shoes when deciding the amount of damages. Instead, the argument appeared to be using the second person "you" to describe Doy's mesothelioma diagnosis and experience from his

prospective. The Coogans' attorney's remarks switched fluidly between the second person "you" and references to Doy in the third person.

In denying GPC's motion for a new trial on this basis, the trial court found that the Coogans' attorney's use of the word "you" in this context was like using the word "one," and that it was a common "vernacular or . . . pronoun usage" without referring specifically to the jurors the Coogans' attorney was addressing. RP (Dec. 1, 2017) at 49-50. The court also noted that this usage was "a fairly innocuous objection and easy to correct," but that despite the fact GPC and NAPA had not made the objection at trial, they were now bringing the objection months later. RP (Dec. 1, 2017) at 50.

Nothing in the record suggests that any prejudice from the Coogans' attorney's argument could not have been cured by an instruction. We hold that the trial court did not abuse its discretion in denying GPC and NAPA's motion for a new trial on the basis of these comments.

c. Urging the Jury to Punish a Wealthy Defendant

GPC argues that the Coogans' attorney engaged in misconduct by making several statements during closing argument that improperly encouraged the jury to base its verdict on the wealthy defendants' ability to pay and to punish them for Doy's death.

During closing, the Coogan's attorney stated to the jury that GPC was a "multinational company" with "resources." 47 RP (April 13, 2017) at 171. She also stated,

> I promise you that, first, I'm not looking to change the world or how a multinational business is doing business. I don't think that can happen here. *But I want something that matters for what they took.* And my suggestion to you is that at the least in a case where you hear millions of dollars thrown around like nothing that lasted for twelve weeks that the bottom of that range for 15 years of life lost should be 30 million dollars at the least.

47 RP at 190 (emphasis added).

The Coogan's attorney further told the jury that "I hope it is clear that the reason you are taking this time is because this loss is serious because this wasn't a bad day for a bad employee of this company. This is a pattern of outrageous behavior for years. And something needs to be done." 47 RP at 193.

These comments could be interpreted as trying to convince the jury to punish the wealthy defendants or to make sure they never harmed someone else in the same way Doy had been harmed. However, taken in context, the Coogans' attorney's remarks argued that GPC and NAPA had culpability for Doy's long history of asbestos exposure, that his family should be compensated accordingly, and that GPC and NAPA were undervaluing the extent of damages to the Coogans. Such arguments are not improper.

In addition, GPC and NAPA did not object to these arguments at trial. On this basis, the trial court denied GPC and NAPA's post-trial motions, stating "I'm troubled by the fact that there were no objections made during closing to the things that the Defense is now citing to as an inflammatory factor. . . . you have to make an objection in a timely way or lose it." RP (Dec. 1, 2017) at 57-58. GPC fails to demonstrate that any prejudicial effect from these comments could not have been cured by an instruction.

Accordingly, we hold that the trial court did not abuse its discretion in denying GPC and NAPA's post-trial motions based on these comments during closing argument.

d. Expressing Personal Opinions

GPC also argues that the Coogans' attorney engaged in misconduct by improperly expressing her personal opinions about the case during closing argument.

The Coogans' attorney stated during closing, "You heard about other exposures. We agree they happened. They were part of the problem. *I think the Wagstaff one is made up*. If

you disagree with me, okay. There can be more than one proximate cause." 47 RP at 185-86 (emphasis added). She also said that "If there is emotion, it is because *I believe* the lack of justice and respect is profound repeatedly [*sic*] for decades to families all over this country and to one of their own." 47 RP at 190 (emphasis added). She continued "*I'm telling you what I believe is right* for what everybody should pay for what happened to [the Coogans]. And *I believe* with no question that anything below [a $30 million verdict] [GPC and NAPA are] going to consider a victory." 47 RP at 191 (emphasis added).

The Coogans' attorney improperly framed her arguments in terms of her personal beliefs. However, her statement about Wagstaff could be interpreted as arguing an inference that Doy's position at Wagstaff may not have actually resulted in any exposure because there was little evidence to describe his work there. Likewise, her arguments regarding "the lack of justice and respect" for families like the Coogans and the appropriateness of a $30 million verdict could be interpreted as arguing an inference that GPC and NAPA had acted wrongfully with respect to Doy and that the resulting loss to his family was very great. 47 RP at 190. Taken in context, the Coogans' attorney's remarks argued that GPC and NAPA had culpability for Doy's long history of asbestos exposure and that his family should be compensated accordingly, despite GPC and NAPA's efforts to minimalize the extent of the damages.

GPC and NAPA did not object to these arguments at trial. GPC fails to show that the Coogans' attorney's statements in this regard could reasonably have affected the jury's verdict. Even if the Coogans' attorney's use of "I think" and "I believe" statements was improper, GPC fails to demonstrate that any prejudicial effect of these comments could not have been cured by an instruction.

Accordingly, we hold that the trial court did not abuse its discretion in denying GPC and NAPA's post-trial motions based on the comments of the Coogans' attorney during closing argument.[5]

E.      EXCLUSION OF EVIDENCE REGARDING WAGSTAFF OCCUPATIONAL EXPOSURE

GPC argues that the trial court erred in excluding evidence that five employees who worked at Wagstaff, Inc. during the same period as Doy contracted asbestos-related diseases because this evidence tended to show that Doy's exposure at Wagstaff was the cause of his mesothelioma. We disagree.

1.      Legal Principles

We review the trial court's evidentiary rulings for an abuse of discretion. *Mut. of Enumclaw Ins. Co. v. Gregg Roofing, Inc.*, 178 Wn. App. 702, 728, 315 P.3d 1143 (2013). Only if the trial court's ruling on the admissibility of evidence was "manifestly unreasonable, exercised on untenable grounds, or based on untenable reasons" will we overturn it. *Id.*

Under ER 402, only relevant evidence is admissible. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. The relevance threshold is low, and even minimally relevant evidence can be admissible. *Kappelman v. Lutz*, 167 Wn.2d 1, 9, 217 P.3d 286 (2009).

---

[5] GPC also argues that the Coogans' attorney has engaged in a pattern of misconduct in trials across the country, citing cases from other jurisdictions in which she had a role. GPC requests this court take judicial notice of those decisions. We decline to do so because the attorneys' behavior in other trials is not material to whether she committed misconduct in this trial.

2.    Analysis

Doy worked at Wagstaff in 1968 and 1969.  He was employed as a "specialist" and was a member of the machinist union during his employment.  However, there was no evidence of what Doy's actual job duties involved or what part of the facility he worked in, and the only indication that Doy had worked at Wagstaff was in his Social Security records.  There was no evidence that Doy cut and handled Marinite boards – a known source of asbestos exposure – at Wagstaff or worked in close proximity to anyone who did.

At trial, GPC and NAPA argued that the evidence was relevant to Doy's case because all five workers were employed at Wagstaff during the late 1960s or early 1970s, worked with asbestos-containing boards, and later contracted asbestos-related diseases.  GPC and NAPA also argued that the amphibole asbestos that Wagstaff Marinite boards were made from was more likely to cause mesothelioma than the chrysotile asbestos found in GPC products.  GPC and NAPA contended that because Wagstaff was a small workplace, it was more likely that a higher percentage of its employees were exposed to asbestos.

The trial court excluded evidence of the Wagstaff workers' compensation claims because there was no evidence establishing that Doy's exposure was similar to that of the claimants.  Beyond the fact that Doy appeared to have spent seven quarters at Wagstaff, there was no evidence to determine the frequency, duration, or type of his potential exposure at Wagstaff.  There was no evidence to definitely establish that Doy's job at Wagstaff involved or was related to handling asbestos, or that he was "one of the three or four people that was actually working in the room where the [Marinite] material was being manipulated."  20 RP at 9.  The trial court excluded one of the claims because the claimant had started working at Wagstaff at least three years after Doy had left and contained no information about Doy's job at Wagstaff.

We agree with the trial court's reasoning. Here, the evidence of other workers' asbestos exposure did nothing to establish that Doy himself had been exposed to asbestos at Wagstaff in the same way as the others. The only information tying Doy to Wagstaff in any way was his Social Security records, which did not provide any description of his work at Wagstaff. And there was no evidence regarding what Doy did at Wagstaff.

Further, the trial court's ruling did not result in the exclusion of all evidence related to Doy's potential exposure at Wagstaff. The trial court allowed evidence that Doy may have been exposed to drifting asbestos fibers at Wagstaff as a result of the concentration of molten metal Marinite being worked on at the facility. The Coogans' occupational exposure expert Dr. Brodkin testified that asbestos fibers can float in the air and that people working with and around asbestos can kick up the dust and be re-exposed.

The trial court excluded only the evidence related to the workers' compensation claims of the workers with asbestos-related diseases. GPC and NAPA's offer of proof included workers' compensation claim forms for each of the five claims. Although GPC argues that the trial court's ruling prevented them from introducing evidence critical to its defense, the ruling merely prohibited the introduction of third party claims.

Because GPC and NAPA were permitted to introduce other relevant evidence of the potential for amosite asbestos fiber drift throughout the Wagstaff facility, the evidence related to specific workers' compensation claims would have been cumulative. "Exclusion of cumulative evidence is not reversible error." *Gregg Roofing*, 178 Wn. App. at 731.

Given the lack of any evidence about what work Doy performed at Wagstaff and what exposure to asbestos (if any) he had there, we hold that the trial court did not abuse its discretion in excluding the Wagstaff evidence.

F.      LIABILITY OF NAPA

NAPA argues the trial court erred in denying its CR 50(a) motion because the Coogans

did not present sufficient evidence that NAPA was a manufacturer or seller of an asbestos-

containing product under the common law or the Washington Products Liability Act (WPLA),

chapter 7.72 RCW.[6]  We disagree.

1.      Legal Principles

Under CR 50(a)(1), a court may grant judgment as a matter of law on an issue if "there is

no legally sufficient evidentiary basis for a reasonable jury to find [for the adverse party] . . .

with respect to that issue."  Granting a CR 50 motion "is appropriate only when no competent

and substantial evidence exists to support a verdict."  *Faust v. Albertson*, 167 Wn.2d 531, 537,

222 P.3d 1208 (2009).  We review de novo the trial court's denial of a CR 50(a) motion for

judgment as a matter of law.  *Washburn v. City of Federal Way*, 178 Wn.2d 732, 752-53, 310

P.3d 1275 (2013).[7]

On review, we admit the truth of the nonmoving party's evidence and all reasonable

inferences that can be drawn from that evidence.  *Gregg Roofing*, 178 Wn. App. at 725.  A

motion for judgment as a matter of law can be granted if we determine that "there [is] no

substantial evidence or reasonable inference to sustain a verdict for the nonmoving party."  *Id.*

---

[6] NAPA also appears to suggest that the trial court erred in denying its pretrial motion for summary judgment on this issue.  But a party cannot appeal a denial of summary judgment following a trial if the denial was based on a determination that there were disputed material facts  that must be resolved by a trier of fact.  *Johnson v. Rothstein*, 52 Wn. App. 303, 304, 759 P.2d 471 (1988).

[7] The Coogans appear to argue that NAPA's CR 50(a) motion is not reviewable because NAPA did not renew its motion for judgment as a matter of law after trial or under CR 50(b), nor did it seek a new trial on that basis.  But in *Washburn v. City of Federal Way*, the Supreme Court held that the appellant did not waive review of the denial of its CR 50(a) motion by failing to renew it with a CR 50(b) motion after the jury verdict.  178 Wn.2d at 762.

Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the asserted premise. *Wilcox v. Basehore,* 187 Wn.2d 772, 782, 389 P.3d 531 (2017).

> 2. Applicability of Common Law vs. WPLA

NAPA argues that the trial court erred by allowing the jury to decide whether the common law or the WPLA should apply to the Coogans' claims. We decline to address this issue.

The WPLA governs all product liability claims arising on or after July 26, 1981. RCW 4.22.920(1). But the common law applies if substantially all of the plaintiff's exposure to injury-producing products occurred before the WPLA's effective date. *Macias v. Saberhagen Holdings, Inc.*, 175 Wn.2d 402, 408, 282 P.3d 1069 (2012).

NAPA argues that the trial court erred in giving an instruction that allowed the jury to determine whether substantially all of Doy's exposure to asbestos occurred before July 26, 1981. However, a CR 50(a) motion is made *before* the case is submitted to the jury. CR 50(a)(2). Therefore, the trial court's ruling on NAPA's CR 50(a) motion occurred before the court gave the jury instructions.

In any event, NAPA did not object to giving this instruction. After proposing several minor changes in wording, NAPA agreed to the instruction. In order to preserve a challenge to a jury instruction for review, a party must make a proper objection. *Millies v. LandAmerica Transnation*, 185 Wn.2d 302, 313, 372 P.3d 111 (2016). CR 51(f) requires a party objecting to a jury instruction to "state distinctly the matter to which counsel objects and the grounds of counsel's objection." Therefore, we hold that NAPA failed to preserve its challenge to the court's instruction, and we decline to consider this issue.

Further, NAPA argues that it was not a product manufacturer or seller and was entitled to judgment under CR 50(a) under either the common law or the WPLA. Therefore, as NAPA concedes, the applicability of the WPLA ultimately makes no difference.

3.    NAPA as Product Seller or Manufacturer

NAPA argues that that the trial court erred in denying its CR 50(a) motion because the Coogans did not provide substantial evidence that NAPA was a product seller or manufacturer as defined in the common law or the WPLA. The Coogans contend that there was substantial evidence that NAPA manufactured, distributed, and sold the products Doy used. We agree with the Coogans.

a.    Legal Principles

In *Ulmer v. Ford Motor Co.*, the Supreme Court adopted the rule of strict liability for product manufacturers stated in § 402A of the *Restatement (Second) of Torts* (Am. Law Inst. 1965). 75 Wn.2d 522, 530-32, 452 P.2d 729 (1969). Section 402A imposes strict liability on a person selling a defective product. Strict liability applies if "the seller is engaged in the business of selling such a product." *Id.* § 402A(1)(a). Comment f states that this rule applies to products manufacturers and to "any wholesale or retail dealer or distributor." *Id.* § 402A cmt. f.

The court in *Seattle-First National Bank v. Tabert* extended the strict liability rule to product sellers and distributors, including importers. 86 Wn.2d 145, 148-49, 542 P.2d 774 (1975). The court noted that § 402A extended liability to "those in the chain of distribution." *Id.* at 148. Since *Tabert*, the court repeatedly has confirmed that as a general rule, strict products liability applies to all persons in the chain of distribution of a product. *Macias*, 175 Wn.2d at 410-11; *Braaten v. Saberhagen Holdings*, 165 Wn.2d 373, 384, 198 P.3d 493 (2008); *Zamora v. Mobil Oil Corp.,* 104 Wn.2d 199, 206, 704 P.2d 584 (1985). Under this law, the trial court

instructed the jury that liability could be imposed on NAPA if it was a product seller or manufacturer.

However, the case law does not provide specific definitions for what constitutes a manufacturer, seller, or distributor of a product or what encompasses the "chain of distribution."

        b.    Substantial Evidence Regarding NAPA Liability

The question presented on NAPA's CR 50(a) motion was whether the evidence presented at trial would allow a jury to find that NAPA was a product manufacturer, seller, or distributor of asbestos-containing products to which Doy was exposed.

NAPA presented evidence that it did not manufacture or sell the asbestos-containing products that Doy used. Frantz, the corporate representative for GPC, testified that NAPA is a "trade organization" that "does not make or sell anything." 17 RP at 147-48. And Jay Coogan testified that the NAPA stores in Kettle Falls and Colville were independently owned. There was no *direct* evidence to contradict NAPA's claim that it did not manufacture or sell any products.

In addition, NAPA presented evidence that NAPA did not distribute the asbestos-containing products that Doy used. NAPA presented evidence that GPC owned the distribution center in Spokane, which supplied parts to the NAPA stores in Kettle Falls and Colville. According to Frantz, GPC acquired ownership of the distribution center in the early to mid-1960s. GPC's ownership coincides with Doy's first major period of exposure beginning in 1963. There was no *direct* evidence to contradict NAPA's claim that it did not distribute any products.

However, the NAPA name appeared on the labels of Rayloc brakes and clutches that Doy used. NAPA also placed an "Assurance of Quality" stamp on the label of American Brakeblok brake linings, which Doy used. And NAPA's promotional materials created the appearance that

NAPA was the manufacturer or retailer of Rayloc and American Brakeblok brakes. Finally, the NAPA brand was located on a logo touting Rayloc as the world's largest remanufacturer.

In addition, the facility in Spokane that distributed Rayloc brakes and clutches was referred to as a NAPA Distribution Center. And the stores in Kettle Falls and Colville where Doy purchased asbestos-containing products were known as NAPA stores and they displayed large NAPA signs on their storefronts.

The jury reasonably could infer from NAPA's branding of products, stores, and the Spokane distribution center that NAPA was a product manufacturer, seller, or distributor even in the face of NAPA's self-serving evidence that NAPA actually *did not* manufacture, sell, or distribute any product. The jury was free to weigh and reject that evidence.

Viewing the facts and the reasonable inferences from the facts in the Coogans' favor, we conclude that there was substantial evidence to establish that NAPA actually manufactured, distributed, or sold any products that exposed Doy to asbestos. Accordingly, we hold that the trial court did not err in denying NAPA's CR 50(a) motion for judgment as a matter of law.

## CONCLUSION

We reverse the jury's verdict on damages, but we affirm the jury's verdict on liability. We remand for a new trial on the damages issues only.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Maxa, C.J.

MAXA, C.J.

LEE, J. (dissenting in part) — I agree with the majority opinion in all respects except for the issue of attorney misconduct. Because of the attorney misconduct committed by the Coogans' attorney, I would reverse the liability verdict. Accordingly, I respectfully dissent in part.

CR 59(a)(2) allows for a new trial if the misconduct of the prevailing party substantially affects the substantial rights of the other party. We review a trial court's order denying a motion for a new trial under CR 59(a)(2) for an abuse of discretion. *Aluminum Co. of Am. v. Aetna Cas. & Sur. Co.*, 140 Wn.2d 517, 537, 998 P.2d 856 (2000). Review of the trial court's order is generally limited to determining whether the trial court's reasons adequately support its order. *Clark v. Teng*, 195 Wn. App. 482, 492, 380 P.3d 73 (2016), *review denied*, 187 Wn.2d 1016 (2017). "A trial court abuses its discretion only if its decision is manifestly unreasonable or based on untenable grounds or reasons." *Id*. A trial court's order that relies on unsupported facts or "'a clearly erroneous assessment of the evidence' necessarily abuses its discretion." *Id.* (quoting *Demelash v. Ross Stores, Inc.*, 105 Wn. App. 508, 530, 20 P.3d 447, *review denied*, 145 Wn.2d 1004 (2001)).

A party seeking a new trial based on counsel's conduct must establish that (1) the conduct was misconduct, (2) the misconduct was prejudicial, (3) the misconduct was objected to at trial, and (4) the prejudice was not cured by the trial court's instructions. *Teter v. Deck*, 174 Wn.2d 207, 226, 274 P.3d 336 (2012). A new trial is appropriate when "'such a feeling of prejudice [has] been engendered or located in the minds of the jury as to prevent a litigant from having a fair trial[.]'" *Aluminum Co. of Am.*, 140 Wn.2d at 537 (quoting *Moore v. Smith*, 89 Wn.2d 932, 942, 578 P.2d 26 (1978)).

Generally, the trial court is in the best position to determine prejudice. *Miller v. Kenny*, 180 Wn. App. 772, 815, 325 P.3d 278 (2014). Although we grant great deference to the trial

court's findings regarding prejudice, that deference is not absolute. *Clark*, 195 Wn. App. at 492, 497. If the trial court's finding regarding prejudice is contrary to, or unsupported by the record, the finding is not entitled to deference. *Id*. at 492.

Here, Genuine Parts Company (GPC) raises three instances of misconduct during trial that support a new trial: (1) questioning regarding other asbestos-related deaths caused by Rayloc brakes, (2) implying GPC acted in bad faith when selecting its corporate witness, and (3) eliciting an outburst from Jay Coogan.[8] I would hold that these instances of misconduct were prejudicial, and the trial court abused its discretion by denying the motion for a new trial.

A.      QUESTIONS REGARDING OTHER ASBESTOS-RELATED WORKER DEATHS

Pretrial, the trial court ordered that no party could present evidence about any asbestos-related exposure by workers at defendants' plants or any claims by those workers. 5 RP (Jan. 25, 2017) 41-42. During trial, the Coogans' attorney asked GPC's corporate representative, "Do you know how many other men that worked in their headquarters where they were making Raylock (sic) brakes have died from asbestos-related disease and haven't been called?" 22 Verbatim Report of Proceedings (VRP) (Feb. 27, 2017) 84. I agree with the majority's conclusion that this question was clearly improper and violated the trial court's pretrial ruling. Majority at 28. However, I disagree with the majority's conclusion that there was insufficient prejudice to merit reversal.

The majority appears to have determined that the challenged question was not prejudicial simply because it was only one question during three-month long trial. Majority at 28. This conclusion is contrary to the record.

---

[8] I agree with the majority that the trial court did not abuse its discretion in denying GPC and National Automotive Parts Association's (NAPA) CR 59(a)(2) motion based on the comments made by Coogans' attorney during closing argument because GPC and NAPA did not object to those comments during trial.

Although this was only one question, the question, in violation of the trial court's pretrial order, clearly implied that GPC was aware of and responsible for other asbestos-related worker deaths at its Rayloc brakes facility, which is extremely prejudicial to GPC. And this implication was compounded by the trial court's instruction given to the jury the next day, which stated,

> Yesterday Plaintiffs' counsel asked a question of Ms. Brewer regarding deaths at the Rayloc facility. *There will be no evidence of deaths at the Rayloc facility related to asbestos exposure in this case. You may not consider such fact* in your deliberations of this case, and you may not discuss that in your deliberations of the case.

23 VRP (Feb. 28, 2017) at 55 (emphasis added). The trial court's instruction injected facts not in evidence by implying and confirming that there is evidence of other asbestos-related deaths. Thus, the jury heard the implication in counsel's question that there were other asbestos-related deaths at the Rayloc brakes facility, and then the trial court reminded the jury of the existence of other asbestos-related deaths the next day. Having the existence of such evidence confirmed by the trial court, the jury was then told not to consider it.

Because of the significance of evidence of other asbestos-related deaths, neither the length or complexity of the trial is sufficient reason to justify a finding that the Coogans' attorney's question in direct violation of the trial court's pretrial order, compounded by the trial court's instruction confirming the existence of such evidence, was not prejudicial. Nor can it be said that the trial court's limiting instruction, which confirmed the existence of facts not in evidence and accomplished for the Coogans what they intended with the objectionable question, cured any prejudice. Furthermore, the excessive amount of the jury's verdict, which the majority agrees shocks the conscience and is "flagrantly outrageous and extravagant," shows that the jury was influenced, at least to some extent, by the prejudice caused by the Coogans' attorney's improper

question and the trial court's limiting instruction. Majority at 24, quoting *Bingaman v. Grays Harbor Cmty. Hosp.*, 103 Wn.2d 831, 835, 699 P.2d 1230 (1985).

Because of the significance of the implication of other asbestos-related worker deaths, I would reverse the trial court's order denying the CR 59(a)(2) motion for a new trial on this basis alone.

Also, the trial court simply denied the motion for a new trial based on conduct during the trial because the instances of alleged misconduct were isolated among a very long trial containing a great deal of properly admitted evidence. It is an abuse of discretion for the trial court to have summarily dismissed this allegation of misconduct without considering whether the conduct was misconduct that was prejudicial and objected to at trial, and whether the prejudice was cured by the trial court's instructions. *Teter*, 174 Wn.2d at 226.

B.      IMPLYING BAD FAITH IN SELECTION OF CORPORATE WITNESS

GPC also argues that the Coogans' attorney committed misconduct by asking questions that implied GPC selected Byron Frantz as corporate representative in bad faith in order to hide information. Without deciding whether the Coogans' attorney's questions were improper, the majority decides this issue based on GPC's failure to show prejudice. Majority at 29. I disagree. The Coogans' attorney's questions were improper, prejudicial, and not cured by the trial court's instructions to the jury.

The Coogans' attorney's questions regarding why Frantz was selected and why certain people were not present were improper. As the majority recognizes, an attorney has a duty to keep inadmissible evidence from the jury. Majority at 26; ER 103(c). And as the trial court recognized, the reasons why a corporate representative is selected is irrelevant and inadmissible, and "the company is entitled to select its corporate representative." 22 VRP (Feb. 27, 2017) at 102. Despite

having an objection to her improper question sustained, the Coogans' attorney again asked the improper question.

The majority asserts that there is no prejudice because it was apparent that Frantz was unprepared as a witness. Majority at 29. However, there is a significant difference between a witness being unprepared and implying that a witness was specifically chosen in order to deliberately keep information from the jury. Here, the Coogans' attorney's conduct goes beyond pointing out the witness was unprepared and, instead, ascribes a bad faith motive on behalf of GPC. Furthermore, the Coogans' attorney also implied that other people were deliberately kept from the jury because they had more information. I would hold that the Coogans' attorney's conduct was prejudicial and prevented GPC from getting a fair trial.

And the prejudice from the Coogans' attorney's conduct was not cured by the trial court's comment sustaining GPC's objection. Here, the trial court commented to the jury that "the company is entitled to select its corporate representative and why they do that is up to them." 22 VRP (Feb. 27, 2017) at 102. This comment highlighted and reinforced the implication intended by the Coogans' attorney relating to the reasons why the corporate representative was selected. Moreover, the trial court did not even tell the jury that it could not consider the reasons; it simply reinforced the prejudicial effect of the objectionable questions.

Also, the majority's assertion that the trial court ruled that these questions were not prejudicial because it was apparent that Frantz was unprepared as a witness is not supported by the record. Majority at 29. The trial court's actual ruling stated:

> So having read all of the briefing on this point—and I read a number of the cases over again—it strikes me that understanding that GPC and NAPA are arguing that the conduct of the Plaintiffs during the course of the trial and during closing was designed to inflame, I have to point out that in a three-month long trial, it is impossible not to be able to go through a record and pull out this question and that one and string together an argument that looks like there was some prejudice when

the great mass of the evidence is what the jury is supposed to consider and what I have to assume they did consider.

VRP (Dec. 1, 2017) at 56. This was the entirety of the trial court's ruling regarding the alleged misconduct during trial. The trial court did not make any reasoned evaluation of whether the Coogans' attorney's questions were misconduct, caused prejudice, or were cured by any trial court instruction. It is an abuse of discretion for the trial court to summarily dismiss this allegation of misconduct without considering whether the conduct was misconduct that was prejudicial and objected to at trial and whether the prejudice was cured by the trial court's instructions. *Teter*, 174 Wn.2d at 226.

### C. ELICITING JAY COOGAN'S OUTBURST

Finally, GPC argues that the Coogans' attorney deliberately elicited an outburst from Jay Coogan, stating that defense counsel accused Jay of killing his brother. I disagree with the majority's analysis because none of it is based on the trial court's reasons for denying the motion for a new trial.

Here, again, the trial court simply denied the motion for a new trial based on conduct during the trial because, according to the trial court, the instances of alleged misconduct were isolated among a very long trial containing a great deal of properly admitted evidence. It is an abuse of discretion for the trial court to have summarily dismissed this allegation of misconduct without considering (1) whether, and to what extent, the Coogan's attorney's elicited the outburst, (2) what specific prejudice was caused by the outburst, and whether the prejudice was cured. *Teter*, 174 Wn.2d at 226.

Also, the challenge here goes to the statement made by Jay that "[a]t one point she [GPC's attorney] accused me of killing my brother." 16 VRP (Feb. 14, 2017) at 160. Although the trial court immediately struck the statement, the trial court told the jury that "*even if true*, [that] is

irrelevant . . . [s]o I want you to remove that from consideration." 16 VRP (Feb. 14, 2017) at 160 (emphasis added). Rather than curing any prejudice, the trial court's comment on the evidence validated the irrelevant evidence.

D.     CUMULATIVE EFFECT OF MISCONDUCT

GPC argues that each instance of misconduct was sufficient to warrant a new trial, but there was "unquestionably prejudice if one considers the cumulative effect of all the misconduct." Br. of Appellant GPC at 44. I agree.

Even if each instance of misconduct above would not merit reversal on its own, the cumulative effect of all the instances of misconduct had the effect of engendering "'such a feeling of prejudice . . . in the minds of the jury as to prevent a litigant from having a fair trial[.]'" *Aluminum Co. of Am.*, 140 Wn.2d at 537 (quoting *Moore*, 89 Wn.2d at 942). As discussed above, the trial court's ruling on the motion for a new trial did not address, either individually or cumulatively, whether the challenged conduct was misconduct, prejudicial, objected to at trial, or cured by a trial court instruction. Rather, the trial court's ruling appears to have been based simply on "the great mass of the evidence." VRP (Dec. 1, 2017) at 56. This was an abuse of discretion.

## CONCLUSION

I disagree with the majority's determination that the trial court did not abuse its discretion by denying the motion for a new trial based on the Coogans' attorney's conduct during trial. Therefore, I would reverse and remand for a new trial. Accordingly, I respectfully dissent from the majority's opinion affirming the trial court's order denying GPC's CR 59(a)(2) motion for a new trial.



Lee, J.

MELNICK, J. (dissent in part) — I respectfully dissent from the majority's opinion that the award of Jerry "Doy" Coogan's noneconomic damages both shocks the conscience of the court and is excessive. I otherwise concur in the majority opinion.

The majority correctly states the law, and I need not repeat it; however, the majority does not give deference to the jury that the parties selected to hear this case. It does not take into consideration that the jury is the sole judge of the credibility of witnesses and of the weight to be given to the witnesses' testimony when deciding damages. *Agranoff v. Morton*, 54 Wn.2d 341, 347, 340 P.2d 811, 815 (1959). The court so instructed in this case.

The majority also does not take into account that the defendants in this case never told the jury what they thought would be a reasonable amount of damages. Rather, the defendants solely argued about liability, and that they had none. They staked their entire case on an all or nothing strategy.

I must emphasize that the majority does not conclude that the jury verdict "is outside the range of substantial evidence in the record" or "appears to have been arrived at as the result of passion and prejudice." *Bingaman v. Grays Harbor Cmty. Hosp.*, 103 Wn.2d 831, 835, 699 P.2d 1230 (1985). Instead the majority bases its ruling solely on its subjective belief, after reading a cold record, that the verdict "shocks the conscience of the court."

The long standing rules that we utilize in this case exist because the jury has heard the testimony, evaluated the witnesses, and decided what facts have been proved. We should not lightly substitute our judgement for that of the jury's.

Here, the jury best understood and decided the suffering Doy experienced. Based on the evidence it saw and heard, the jury understood that this suffering did not occur over a six month period. The six month period is merely the time from when Doy initially saw a doctor until the

time Doy passed away. Doy obviously suffered before that time or he would not have seen a doctor for his pre-existing symptoms.

Doy died a horrible death as a result of the asbestos poisoning. He suffered both from tumors that caused bowel obstruction and fluid buildup, as well as malnutrition and excessive fluid around his lungs. Doy experienced breathlessness caused by the fluid buildup, pain-related insomnia, constipation, dehydration, and kidney failure. He had difficulty drinking liquids. He suffered from severe muscle wasting and malnutrition.

The jury did its job and placed a monetary value on the pain, suffering, anxiety, emotional distress, humiliation, and fear that Doy experienced as a result of these illnesses that the majority and I have merely summarized, but that the jury heard in greater detail. We are not permitted to substitute our judgments for that of the jury's. The jury was instructed that "[t]he law has not furnished us with any fixed standards by which to measure noneconomic (pain and suffering) damages. With reference to these matters you must be governed by your own judgment, by the evidence in this case, and by these instructions." Clerk's Papers at 14988 (Instr. 34).

The verdict for these noneconomic damages does not shock my conscience. No amount of money could ever compensate Doy for the suffering he endured as a result of peritoneal mesothelioma.

Just as the court instructed the jury that there are not any fixed standards by which to measure noneconomic damages, neither are the appellate courts given any fixed standards. I respectfully dissent because the verdict does not shock my conscience and is not excessive.



Melnick, J.